STATE OF NEBRASKA, APPELLEE, V. GARY QUICK, APPELLANT.

511 N.W.2d 168

Filed April 27, 1993.  No. A-92-495.

John M. Gerrard and Samuel G. Kaplan, of Gerrard, Stratton & Mapes, P.C., for appellant.

Don Stenberg, Attorney General, and Mark D. Starr for appellee.

CONNOLLY, MILLER-LERMAN, and WRIGHT, Judges.

CONNOLLY, Judge.

This appeal arises from the appellant's conviction for first degree sexual assault. The appellant originally was charged for an alleged act occurring sometime on or after March 27, 1988, and before April 9, 1988. At trial, after adducing all of its evidence, the State moved to amend the information to conform to the evidence by changing the beginning date of the charged time period to April 25, 1987, thereby extending from 2 weeks to almost 1 year the time period in which the alleged act could have occurred. The appellant opposed the motion on grounds of surprise, lack of notice, and violation of due process. The trial judge granted the motion to amend the information, the trial proceeded, and the appellant was convicted. The appellant's motion for new trial was overruled. We vacate the conviction and sentence, reverse the judgment overruling the motion for new trial, and remand the cause to the district court for a new trial.

## I. FACTS
### 1. VICTIM FLEES FROM HOME

The alleged victim in this case is the mentally retarded daughter of the appellant, Gary Quick. Quick, his wife (mother of the victim), the victim, and the victim's younger brother all lived together in the Quick family residence in the town of Winside, Wayne County, Nebraska, during the time period at issue.

On April 9, 1988, the victim, then 15 years old, appeared at the doorstep of the home of Marilyn Morse, a local social worker. The victim was crying hysterically. The record abounds with testimony from various witnesses, including the victim's mother, as to the regular verbal and physical abuse heaped upon the victim by both of her parents. The victim testified that her parents drank alcohol on a daily basis "from the time they [got] up in the morning until the time they went to bed." Morse opined that based on her training and experience, she believed Quick and his wife were alcoholics. The victim testified that Quick, in particular, would get drunk and then find some pretext on which to harass and beat her. A pretext was not always required; sometimes Quick would ridicule his daughter's

physical appearance or mental limitations. Apparently, April 9 was a typically abusive day in the Quick home. On that day, the victim reached the point at which she "just couldn't take it anymore." She fled the family home and sought refuge at Morse's home.

The victim remained with Morse for a few days, was transferred to a foster home in Winside for the remainder of the spring and summer, and then was placed with her aunt and uncle in Missouri.

### 2. ALLEGATION OF SEXUAL ABUSE

While living in Missouri in the spring of 1991, the victim told a cousin that she had been sexually abused by Quick. That was the first time the victim had successfully communicated the allegation to a third party. At trial, the victim testified that she had tried to tell her mother "more than once but it just wouldn't do [any] good." The victim was known to have lied on other occasions, and apparently her mother dismissed the sexual assault allegations as lies. Prior to the revelation to her cousin, the victim had been unable to verbalize the allegations to anyone other than her mother.

In accordance with procedures under Missouri law, the local child protective services agency referred the victim to a qualified physician for a sexual abuse examination. During the October 1991 examination, the victim told the physician that Quick had sexually abused her approximately four times. The physician testified that while the genital examination of the victim was inconclusive, her "description of the attacks [was] extremely believable . . . and struck me as not having any inconsistencies with being attacked." In the section of the examination report entitled "Findings and Follow-Up," the physician indicated that the victim's history and behavioral indicators were consistent with sexual assault.

### 3. QUICK IS CHARGED

Although at trial the State would offer evidence of a series of four separate sexual assaults, Quick was charged in Wayne County District Court with only one count of first degree sexual assault pursuant to Neb. Rev. Stat. § 28-319(1)(c) (Reissue 1989). In a pretrial deposition, the victim had testified that the

last of the four assaults had occurred 1 week prior to April 9, 1988. The State relied on that testimony in drawing up the information against Quick. The information alleged that Quick had assaulted the victim "on or after March 27, 1988, and before April 9, 1988." Thus, the record indicates that the State went to trial seeking to convict Quick for the fourth and final alleged assault.

### 4. FACTUAL PATTERN OF THE ASSAULTS

At trial, the victim's testimony regarding the pattern of the alleged incidents was quite specific. According to the victim, all four incidents happened in the following manner: Her father, already drunk, would fake a heart attack. The family did not have a telephone, so Quick would instruct his wife and son to go to his mother-in-law's house several blocks away to summon help. Quick would insist that the victim remain behind with him. In the time interval between the departure of his wife and son and the arrival of rescue squad personnel, Quick would take off his clothes and coerce the victim into taking off her clothes or forcibly remove them himself. Quick then would engage in sexual relations with the victim. The victim was not certain whether Quick had ejaculated inside of her, but she was certain that he had inserted his penis into her vagina. Upon completion of the alleged assaults, Quick would get dressed and shout at the victim to do likewise before anyone arrived at the house. The rescue squad would arrive, attend to Quick, and then transport him by ambulance to the hospital.

Later testimony by Winside rescue personnel would show that among the members of the rescue squad, Quick had gained a reputation akin to that of the boy who cried wolf. On several occasions, the rescue squad had responded to a call that Quick was suffering a heart attack, only to find him sprawled on a bed or couch in a drunken stupor with normal vital signs and no indication of a heart attack.

### 5. TIMEFRAME

The victim's testimony about the timeframe within which the final assault and the entire series of assaults occurred was not as specific as her testimony about their pattern. On direct examination at trial, the victim said the last assault had

occurred "at least a month [prior to April 9, 1988], maybe less than that," even though in her pretrial deposition she had placed the last attack within a week of April 9. On cross-examination at trial, the victim said the last assault had occurred "[a]t least two weeks before I ran away" to the Morse residence April 9. After cross-examination of the victim, court was adjourned for the day. On redirect examination the following morning, the victim reasserted the claim she had made in her pretrial deposition: The last assault had occurred a week before she fled to the Morse residence April 9. Again, the record indicates that the one count in the original information was based upon this alleged fourth and final assault.

Based on the victim's testimony on cross-examination, the overall timeframe for the four assaults began sometime in January 1988 and ended the first week of April 1988. The victim remained steadfast in her testimony that rescue personnel had taken Quick to the hospital in an ambulance after each of the four assaults. However, the evidence adduced at trial indicated only two documented occasions—April 26 and August 4, 1987—on which rescue personnel had come to the Quick residence and subsequently transported Quick by ambulance to the hospital. The policy of the rescue squad was to make a written record of every transport to a hospital. According to the victim's testimony, there should have been four ambulance trips for Quick in the January to April 1988 timeframe. Instead, the record shows only two ambulance trips, neither of which occurred within the January to April 1988 timeframe designated by the victim in her trial testimony.

### 6. RESCUE CALL OF APRIL 1987

The State introduced testimony from rescue personnel who had responded to the April 1987 call to the Quick residence. VerNeal Marotz was the ambulance driver on that call. On cross-examination, Marotz testified that the rescue squad "thought something was up" with the victim because she seemed inordinately upset by the situation. He said some members of the rescue squad approached the victim, but were unable to determine exactly what was wrong. In a followup contact with the Wayne County Sheriff's Department, the

rescue squad communicated its concern about the victim.

Shawn Kai also served on the rescue squad that responded to the April 1987 call. While the rescue squad prepared to transport Quick, Kai attempted to calm the victim by assuring her that her father was going to be fine. The victim seemed to draw no consolation from his assurance, so Kai continued to question her in an effort to discover if something else was upsetting her:

> [Kai:] I said, can you tell me what you are upset about? [The victim] was not very communicative . . . [s]o I continued to question her. From there I said, are you upset about something else, and there was affirmation, a nod or, you know, cessation of the crying. . . . I said, is it something that somebody did to you, and there was another affirmation. And then I asked is it something that your father did to you, and there was another affirmation.

Kai apparently did not elicit any further information from the victim.

### 7. AMENDMENT OF INFORMATION

Kai was the State's final witness. At the conclusion of Kai's testimony, the State moved to amend the information to conform to the evidence by expanding the time period set out in the information. The State sought to change the beginning date of the time period from March 27, 1988, to April 25, 1987, thereby expanding from 2 weeks to almost 1 year the timeframe within which the alleged sexual assault might have occurred. The State acknowledged that "[t]he ambulance runs took place in April and August of 1987, but that's not when the [fourth alleged] incident occurred." The State also acknowledged that "the last incident . . . might possibly have occurred more than two weeks ahead of April 9th [1988]." The trial judge asked why the State had failed to amend the information sooner. The State replied that in determining the appropriate timeframe, it had relied on the victim's pretrial deposition, in which she had testified that the last assault had occurred 1 week prior to April 9, 1988.

Defense counsel objected to the motion on grounds of unfair surprise and undue prejudice to the substantial rights of Quick.

The trial judge stated that he was confronted with

a two-edged sword. If I allow the amendment, then any act that occurred during that period would be barred by the verdict of this jury. If I disallow the amendment . . . the [S]tate is free to file on any charge that occurred prior to March 27, 1988 . . . . As much as I dislike an amendment of the information at this time, it is my opinion that the defendant is not surprised by the evidence. . . . So, I don't believe that the defendant has been truly prejudiced. . . .

In the present case, the dates proved would be within the statute of limitations. So I will allow the [S]tate to amend its information [accordingly].

### 8. CONVICTION

Defense counsel immediately moved for a continuance in order to call as witnesses other rescue squad members who, according to defense counsel, remembered the encounter with the victim on April 26, 1987, very differently from Kai's recollection of it. The motion for a continuance was denied.

Defense counsel's motion for dismissal or, in the alternative, a directed verdict was denied. The defense then adduced evidence that the response time of the rescue squad would appear to have left very little time for Quick to accomplish the type of sexual assaults alleged. The defense also adduced additional testimony regarding the victim's problem with lying.

During deliberation, the jury filed a request with the judge asking, "Can [our] decision be made off of gut feelings only?" The judge informed the jury that its decision "should be governed solely by the evidence introduced before you." The jury found Quick guilty of first degree sexual assault. Quick was sentenced to a prison term of 2 to 5 years.

### II. ASSIGNMENT OF ERROR

We reach only one of Quick's assignments of error, as it is dispositive of the appeal: The district court erred in allowing the State to amend the information so that it covered the time period of April 25, 1987, to April 9, 1988.

### III. STANDARD OF REVIEW

A ruling on whether to allow a criminal information to be

amended is made by the trial court in its discretion. See *State v. Aldrich*, 226 Neb. 645, 413 N.W.2d 639 (1987). Therefore, absent an abuse of discretion, we will affirm the decision of the district court to allow amendment of the information.

Judicial abuse of discretion means that the reasons or rulings of the trial court are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result. *State v. Thomas*, 238 Neb. 4, 468 N.W.2d 607 (1991).

## IV. ANALYSIS

The purpose of an information is to apprise a defendant with reasonable certainty concerning the crime charged so that (1) the accused may prepare a defense to the prosecution and (2) if convicted, the accused may plead the judgment of conviction on the charge as a bar to a later prosecution for the same offense. *State v. Beermann*, 231 Neb. 380, 436 N.W.2d 499 (1989). The district court, in its discretion, may permit a criminal information to be amended at any time before verdict or findings if no additional or different offense is charged and the substantial rights of the defendant are not prejudiced. *State v. Aldrich, supra*. As indicated by *Beermann*, one of the substantial rights of the defendant is the right to plead a judgment of conviction as a bar to subsequent prosecution for the same offense. The question before us is whether Quick's due process rights have been violated because the judgment of conviction is ineffective as a bar to future prosecution of Quick for the same conduct for which he was convicted in this case.

In *State v. Piskorski*, 218 Neb. 543, 357 N.W.2d 206 (1984), at the close of its case the State was allowed to amend an information for first degree sexual assault on a child to conform to the evidence by, inter alia, expanding the timeframe within which the alleged offense had occurred. Originally, the defendant had been accused of committing the crime on or after December 11, 1982, and before December 25, 1982. The amended information alleged that the crime had occurred on or after September 1, 1982, and before December 25, 1982. The State had introduced evidence concerning several occasions from September through December when the alleged crime could have occurred. The trial court permitted the amendment

because the amendment did not bring any new charges or raise matters of which Piskorski was previously unaware.

Defendant Piskorski argued that because the State had offered proof of several potential criminal acts, the amended information was prejudicial to his rights in that Piskorski had "no way of knowing which specific act was involved in this conviction and which one is now barred." *Piskorski*, 218 Neb. at 548, 357 N.W.2d at 210. The Nebraska Supreme Court rejected Piskorski's argument on two grounds. First, the Supreme Court observed that a defendant always reserves the right to protect himself against double jeopardy by proving facts outside the information or the record in support of a plea of former adjudication. Second, and more important for our purposes in this case, the Supreme Court recited facts specific to the record in Piskorski's case that clearly identified the particular act for which Piskorski was convicted:

> The instructions . . . in this case . . . specifically advised the jury that it was only to consider testimony with regard to one specific event testified to by both the minor child and her mother. . . .

> When one reviews the information, the instructions to the jury, and the record in this case, one can be left with no doubt that the act charged, and upon which Piskorski was convicted, was a specific act involving assault on the young child while the mother was present. *The record makes it clear that only one such event occurred* while the mother was present, although other violations, not charged in this information, may have occurred. *Therefore, it would not be difficult to establish which act was involved* that resulted in the conviction and is a bar to a subsequent prosecution for the same offense.

(Emphasis supplied.) *Piskorski*, 218 Neb. at 548-49, 357 N.W.2d at 211.

The amendment of the information against Piskorski was valid because, even under an expanded timeframe including multiple occasions of possible criminal conduct, the record yielded a clear answer to the question "For which occasion of alleged criminal conduct was Piskorski convicted?" Answer: Piskorski was convicted for the occasion of sexual assault

during which the mother of the victim was present. Therefore, relying on *Piskorski,* we apply to the facts before us the following proposition of law: When a conviction could be based on any of two or more occasions of indistinguishable criminal conduct alleged at trial, the record must clearly indicate which occasion of criminal conduct supports the conviction in order for the judgment to serve as a bar to future prosecution.

When we ask the question "For which occasion of alleged criminal conduct was Quick convicted?" and then look to the record, we do not get a clear answer. Instead, we get more questions. Did the amended information place Quick in jeopardy for all four of the alleged assaults? In the original information, Quick was charged for the last in the alleged series of four assaults, but at trial the State introduced evidence of a series of assaults and then expanded the timeframe in the information backward into 1987, far beyond any reasonable cutoff date for the timeframe within which the last assault must have occurred.

Although "[c]rimes are not fungible," *State v. Beermann,* 231 Neb. 380, 393, 436 N.W.2d 499, 508 (1989), the trial judge seems to have assumed that the amended information would allow the jury to convict Quick for any of the four alleged occasions of criminal conduct that might have occurred within the expanded timeframe: "If I allow the amendment, then *any act* that occurred during that period would be barred by the verdict of this jury." (Emphasis supplied.) The trial judge cited no authority for such a proposition of law, nor do we find any. However, we can understand the judge's intuitive sense that the amended information must have been intended to implicate more than just the last alleged assault.

We can also understand the jury's request for permission to render a verdict based simply on "gut feelings." According to the victim, the last assault occurred 1 week before April 9, 1988, and the entire series of assaults occurred from January through April 1988. Was the State still asking the jury to convict Quick for the last assault even if, in order to do so, the jury would have to ignore the victim's testimony and instead decide that the last assault occurred anywhere from 8 to 11 months prior to April 9,

1988? That does not seem plausible. We agree with Quick's contention that the amended information effectively said the following to the jury: The State has introduced evidence that Quick sexually assaulted the victim on four different occasions; if you believe that at least one of those assaults occurred, and if you believe that that assault occurred between April 25, 1987, and April 9, 1988, then convict Quick of the one count of first degree sexual assault.

From the record, we cannot answer the question "For which occasion of alleged criminal conduct was Quick convicted?" because under the amended information, Quick's conviction could be based on any of four separate occasions of virtually identical criminal conduct. Contrary to the trial judge's assertion, there is no blanket bar to future prosecution of Quick for any of the four alleged occasions of criminal conduct that may have occurred between April 25, 1987, and April 9, 1988. The State is barred from prosecuting Quick only for the occasion of criminal conduct for which he was convicted.

The problem here, a problem that distinguishes this case from *Piskorski*, is that we have no idea whether Quick was convicted of the first, second, third, or fourth assault. In *Piskorski*, the presence of the victim's mother distinguished the assault for which Piskorski was convicted from the other assaults implicated at trial. In the case before us, the alleged assaults are fungible. The pattern of the alleged crimes is the same in all four incidents. The only facts potentially distinguishing between the incidents are the dates they allegedly occurred, but the only definite dates established in the record—April 26 and August 4, 1987, the dates of documented ambulance trips—do not comport with the victim's own testimony. Furthermore, the victim testified that each of the four assaults was preceded by a call to the rescue squad and followed by transport of Quick by ambulance to the hospital. The record indicates there were only two rescue calls and subsequent ambulance trips within the expanded timeframe set out in the amended information. Simply put, there are not enough ambulance trips to go around.

Even if we ignore the discrepancy between the number of documented ambulance trips and the number of alleged

assaults, how can we determine which occasion of alleged criminal conduct was the one for which Quick was convicted? More important, how can Quick make that same determination if he is prosecuted again for sexual assault of the victim? On the record before us, the State still could prosecute Quick for *any* of the four alleged assaults occurring between April 25, 1987, and April 9, 1988. We are unable to conceive of facts, within or outside the record, that Quick could use to prove that a future prosecution for first degree sexual assault of the victim would be barred by the conviction now before us. For example, if prosecuted again for sexual assault of the victim, Quick could assert that the State was prosecuting him for the fourth assault, and then claim that he had been convicted of the fourth assault in the case now before us. If the State responded that Quick was mistaken, that instead he had been convicted of the third assault, Quick would have no means of proving his assertion. If faced with a future prosecution for sexual assault of the victim, Quick might file a bill of particulars to force the State to specify which assault was being alleged in the subsequent prosecution. However, the State could pick whichever alleged assault it preferred. The factual pattern of each of the alleged assaults is identical. In *Piskorski*, the defendant could rely on a distinguishing fact to prevent the State from prosecuting him for the same assault for which he already had been convicted. In the case before us, there would be no way for Quick to prove that he had already been convicted of the assault alleged in a subsequent prosecution.

## V. CONCLUSION

Because the amended information makes it impossible to determine which of the four alleged assaults was the basis for the conviction of Quick, the possibility exists that in a future prosecution for sexual assault of the victim, Quick could be tried and convicted for the same alleged assault for which he was convicted in the case at bar. Thus, the judgment of conviction in this case is ineffective as a bar to future prosecution for the same criminal conduct on which the present conviction is based. For that reason, we find that the decision to allow the State to amend the information was error prejudicial

to the substantial rights of Quick. Therefore, we vacate the conviction and sentence of Quick, reverse the judgment overruling the motion for new trial, and remand the cause to the district court for a new trial.

CONVICTION AND SENTENCE VACATED.

REVERSED AND REMANDED FOR A NEW TRIAL.